IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL McDONALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 1809 |
| v. | ) | |
| | ) | Magistrate Judge |
| NANCY A. BERRYHILL, Acting | ) | Maria Valdez |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Plaintiff Michael McDonald's claim for Supplemental Security Income ("SSI").[2] The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, the case is remanded for further proceedings consistent with this Opinion.

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

[2] Agency records indicate Plaintiff previously applied for a period of disability and disability insurance benefits (DIB) under Title II of the Act. His application was denied after an administrative hearing by an ALJ on September 12, 2011. (R. 157.) The ALJ's decision therefore became the final decision of the Commissioner and binding on the parties when Plaintiff failed to request review of the ALJ's decision. 20 C.F.R. § 404.955.

# BACKGROUND

## I.    PROCEDURAL HISTORY

On February 29, 2012, Plaintiff protectively filed a claim for Supplemental Security Income, alleging disability since March 1, 2009. (R. 20.) The claim was denied initially and upon reconsideration, after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.*) On February 27, 2014, Plaintiff, represented by counsel, personally appeared and testified at a hearing before ALJ James D. Wascher. (R. 40–79.) Vocational expert ("VE") Lisa Gagliano testified by phone. (*Id.*)

On May 30, 2014, the ALJ denied Plaintiff's claim for Supplemental Security Income, finding him not disabled under the Social Security Act. (R. 20–55.) The Social Security Administration Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.   FACTUAL BACKGROUND

Plaintiff was born on October 22, 1960 and was 51 years old at the time his application was filed. (R. 33.)

### A.    Medical Evidence

On March 3, 2011, Plaintiff sought psychiatric medication and treatment from the Stroger Hospital emergency room and was evaluated by Dr. Jessica Weddle, M.D. (R. 233–37.) Plaintiff reported being depressed all the time and

having auditory and visual hallucinations. (R. 233.) He stated that he had not been able to afford his medications elsewhere after being released from jail three months earlier. (*Id*.) Plaintiff expressed feelings of paranoia, thinking that people were always "out to get him." (R. 234.) He also endorsed recent suicidal ideations. (*Id*.) His mental status examination was relatively normal, with good insight and judgment, normal affect, and mood slightly down. (R. 235–36.) Dr. Weddle assessed schizoaffective disorder assigned a GAF score of 55.[3] Plaintiff was prescribed Risperdal,[4] Doxepin,[5] and Zoloft,[6] and was instructed to follow-up in one month. (R. 236.)

On September 16, 2011, Plaintiff presented to Dr. Adedapo Williams, M.D., at the Fantus Clinic for further evaluation and medication management. (R. 241.) Plaintiff reported auditory and visual hallucinations, anxiety, passive suicidal ideation, and depression. (R. 242.) Dr. Williams noted that Plaintiff was

[3] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM–IV*). A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). *Id.* at 34. The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see Williams v. Colvin,* 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

[4] Risperdal (risperidone) is an antipsychotic medication used to treat schizophrenia and symptoms of bipolar disorder. <https://www.drugs.com/risperdal.html>

[5] Doxepin is a medication used to treat symptoms of depression, anxiety, and insomnia. <https://www.drugs.com/doxepin.html>

[6] Zoloft (sertraline) is an antidepressant used to treat depression, obsessive-compulsive disorder, and panic and anxiety disorders. <https://www.drugs.com/zoloft.html>

appropriately dressed and maintained good eye contact. (R. 244.) He noted mild retardation in psychomotor activity and a slow rate of speech at times with some latency. (*Id.*) Insight and judgment were poor. (*Id.*) Dr. Williams diagnosed psychotic disorder NOS. (R. 245.) He increased the dosages of the doxepin, risperidone, and sertraline, and recommended a follow-up visit in two months. (*Id.*)

Plaintiff next saw Dr. Williams on December 7, 2011, where he continued to endorse auditory and visual hallucinations. (R. 239.) He still felt depressed, although his symptoms had improved since the previous visit. (*Id.*) Sleep was poor. (*Id.*) Plaintiff stated that he felt like there was someone "out to get him" and therefore he did not go out at night. (*Id.*) Mental status examination was "essentially unremarkable." (*Id.*) Dr. Williams noted that Plaintiff was "still depressed and psychotic," diagnosed psychotic disorder not otherwise specified (NOS), and assigned a GAF score of 45.[7] (R. 238–40.)

On May 15, 2012, Dr. Norton B. Knopf, Ph.D., conducted a mental status examination of Plaintiff and issued a psychological report. (R. 255–60.) Plaintiff's major presenting problem was reported as being, "I can't do the job I used to do, I used to do a lot of lifting and standing, and I can't do it like that anymore." (R. 256.) He indicated previous treatment had been "somewhat" successful, although he reported experiencing auditory and visual hallucinations. Dr. Knopf noted Plaintiff's manner of dress was casual and his hygiene appeared good. Plaintiff

---

[7] A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *DSM-IV* at 34.

walked with the help of a cane; however, Dr. Knopf indicated Plaintiff's gait seemed normal without the use of the cane. Posture was normal. (*Id.*)

Dr. Knopf noted that Plaintiff's level of responsiveness did not show any obvious effects of pain, medications, or drugs; there were no overt signs of distress during the interview. Plaintiff reported current feelings of moderate depression, stating he felt depressed "all the time." He reported experiencing loss of interest (in swimming), motor retardation, sleep disturbance, fatigue, and loss of sexual interest. (*Id.*) Plaintiff stated he felt anxious "every day," and that his anxiety was severe; however, Dr. Knopf observed to signs of anxiety during the interview. (R. 257.) Plaintiff endorsed anxiety-related symptoms of chest pains, dizziness, faintness, and dry mouth.

Plaintiff was fully oriented. He remembered five digits forward and four backward. He recalled the name of his elementary school, his birthdate, address, and phone number. Dr. Knopf estimated Plaintiff's intelligence to be in the borderline range. There was no indication of notable decline in intellectual ability. His fund of information was consistent with his background and intellectual level. Plaintiff correctly performed simple addition, subtraction, and division problems. He knew a similarity and a difference between a bush and a tree. There were no signs of aphasia or cognitive deficits typically associated with a brain dysfunction. (*Id.*)

Dr. Knopf concluded that based on the character and coherency of Plaintiff's responses, spontaneous comments, and behavior, the information obtained during

the interview was believed to be reliable. (R. 259.) Thus, the results of the examination were believed to be reliable and valid. Dr. Knopf opined that Plaintiff's personality was best characterized as "schizoid." Plaintiff's insight into his own psychological functioning and adjustment and judgment appeared to be fair. Dr. Knopf diagnosed psychotic disorder NOS, and depressive disorder, NOS (by history). He deferred the Axis II diagnoses, but wrote "rule/out borderline intellectual functioning." (*Id.*)

On June 11, 2012, Plaintiff returned to Dr. Williams, again reporting auditory and visual hallucinations, feelings that "someone might be out to get him," and fleeting thoughts of suicide. (R. 312.) Plaintiff indicated a loss of interest and stated his concentration and memory were poor. He reported feelings of anxiety, poor sleep, and difficulty getting up in the morning. The risperidone provided very short-lived relief. (*Id.*) Mental status examination was noted to be unremarkable. (R. 313.) Dr. Williams again described Plaintiff as "still depressed and psychotic," increased the risperidone to 3mg, and assigned a GAF score of 45. (R. 311, 313.)

When Plaintiff next followed up with Dr. Williams in September 2012, he indicated he was "doing better" and felt the medications were helping. (R. 308.) However, he was still experiencing auditory hallucinations, and reported seeing "silly stuff, just off the wall." Plaintiff also reported occasional paranoia. He was still experiencing depression, but indicated it was only for short periods of time. (*Id.*) Mental status examination was essentially unremarkable and Dr. Williams continued to describe Plaintiff as "still depressed and psychotic." (R. 308–09.) Dr.

Williams continued Plaintiff's current medications and assigned a GAF score of 45. (R. 307, 309.)

Plaintiff's final visit of record with Dr. Williams was on November 19, 2013. (R. 334–36.) Plaintiff reported having problems with child support, and stated his mood had been "scared, panicky, worried, and depressed." (R. 334–35.) He reported fleeting thoughts of suicide and endorsed continuing auditory hallucinations. (R. 335.) Dr. Williams noted that Plaintiff was well-groomed, cooperative, and maintained good eye contact. No psychomotor agitation or retardation was noted; insight and judgment were good. (*Id.*) Dr. Williams assessed Plaintiff as "still depressed and psychotic – maintained by ongoing psychosocial stressors." (R. 336.) Dr. Williams diagnosed schizoaffective disorder and assigned a GAF score of 45. (R. 334.) Medications were continued with no changes. (R. 336.)

### B. **Plaintiff's Testimony**

Plaintiff testified that he sees "crazy things" that are not there, and constantly hears voices in his head. (R. 56–58.) He sees Dr. Williams at the Fantus Clinic for his medications. (R. 65.) He typically goes to Dr. Williams every three months, but stated he often doesn't wait that long and goes to see the doctor between appointments. (R. 65–66.) He tries to take his medications regularly, but forgets sometimes. (R. 65.) Plaintiff testified that the medications do help some, but they do not completely get rid of his hallucinations. (*Id.*)

Plaintiff currently lives with his girlfriend of approximately sixteen years. (R. 67–68.) She often has to remind him to take care of his personal needs, such as

showering, shaving, and getting dressed. (R. 68.) Plaintiff does not cook, clean, do

the laundry, or go grocery shopping. (*Id.*) He does take the garbage out. (R. 69.)

Plaintiff spends most of his time at home, and takes the bus to his doctor

appointments. (*Id.*)

## C. ALJ Decision

The ALJ found at step one that Plaintiff had not engaged in substantial

gainful activity ("SGA") since his alleged disability onset date of March 1, 2009. (R.

22.) At step two, the ALJ concluded that Plaintiff had severe impairments of

schizoaffective disorder, psychotic disorder, borderline intellectual functioning, pain

in the lumbar spine, pain in the bilateral knees, pain in the right shoulder, and

benign paroxysmal vertigo. (*Id.*) At step three, the ALJ determined that Plaintiff

did not have an impairment or combination of impairments that met or medically

equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart

P, Appendix 1. (R. 23.) The ALJ then assessed Plaintiff's Residual Functional

Capacity ("RFC")[8] and determined that Plaintiff retained the RFC to perform light

work, with the following limitations:

> He can never climb ladders, ropes, or scaffolds. He can occasionally
> climb ramps or stairs. The claimant can occasionally stoop and crouch.
> He can only occasionally reach with the dominant right hand. He
> should avoid concentrated exposure to pulmonary irritants such as
> fumes, odors, dusts, and gases. The claimant should avoid
> concentrated exposure to hazards such as machinery with moving,
> mechanical parts and unprotected heights. In addition, because of the
> claimant's limitations in his ability to maintain concentration,

---

[8] Before proceeding from step three to step four, the ALJ assesses a claimant's residual
functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum
that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*,
539 F.3d 668, 675–76 (7th Cir. 2008).

persistence, and pace, the claimant is limited to performing routine, repetitive tasks involving only simple work-related decisions and with only routine workplace changes. The claimant could not have sustained interaction with the public. He could not have joint or shared tasks with coworkers.

(R. 26.) At step four, the ALJ concluded that Plaintiff had no past relevant work. (R. 33.) Finally, at step five, based upon the VE's testimony and Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including a food products sorter. (R. 34.) Because of this determination, the ALJ found that Plaintiff was not disabled under the Act. (R. 34–35.)

## DISCUSSION

## I.   ALJ LEGAL STANDARD

To be granted SSI, a claimant must establish that he or she is disabled within the meaning of Social Security Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[9] A person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the

---

[9] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 et seq. The standard for determining SSI is virtually identical to that used for Disability Insurance Benefits (DIB). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008). Accordingly, this Court cites to both DIB and SSI cases.

impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. §§ 416.909, 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.   JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence,

resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (internal citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698

(7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III.   ANALYSIS

Plaintiff asserts the following errors on appeal: (1) the ALJ failed to give the appropriate weight to treating and examining doctors; (2) the ALJ erred in finding that Plaintiff did not meet or equal Listing 12.03 (Schizophrenic, Paranoid, and Other Psychotic Disorders) and Listing 12.04 (Affective Disorders); (3) the ALJ made improper credibility determinations and failed to properly articulate his reasons; (4) the ALJ substituted his own inexpert opinion; (5) the ALJ failed to fully and fairly develop the record; (6) the ALJ failed to include all of the relevant limitations in hypothetical questions posed to the VE; and (7) the ALJ failed to properly consider Plaintiff's GAF scores.

Plaintiff first argues that the ALJ failed to adhere to the "treating physician rule" by affording only "little weight" to the opinion of Plaintiff's treating psychiatrist, Dr. Williams. By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's

limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

Furthermore, even where a treater's opinion is not given controlling weight, an ALJ must still determine what value the assessment does merit by considering a variety of factors set forth in 20 C.F.R. § 404.1527. S*cott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Campbell*, 627 F.3d at 308. In other words, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[ ] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 1002 (citations omitted). To build a logical bridge, the ALJ must "sufficiently articulate his assessment of the evidence to assure [the court] that he

considered the important evidence and to enable [the court] to trace the path of his reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citation omitted).

Dr. Williams opined that Plaintiff suffers from schizoaffective disorder, which is a severe, chronic, and disabling mental illness. (R. 326.) He further opined that as a result of Plaintiff's condition, Plaintiff does not have the level of functioning required to be gainfully employed. *(Id*.) The ALJ offered several reasons for affording Dr. Williams's opinion little weight. First, the ALJ concluded that Dr. Williams's correlating treatment notes did not wholly support his opinion that Plaintiff's condition was "disabling" because Dr. Williams made no changes to Plaintiff's medications and recommended a follow-up visit in three months. (R. 30.) In addition, while Dr. Williams's "report of [Plaintiff's] subjective symptoms indicated some mental health limitations," the mental status examination on that date was unremarkable, and the previous two mental status examinations had been "essentially unremarkable." (R. 30–31.) Second, the ALJ noted that the opinion of disability is an issue reserved to the Commissioner. (R. 31.) The ALJ characterized Dr. Williams's opinion as a "conclusory statement that the claimant was disabled," and criticized Dr. Williams for failing to provide a function-by-function analysis. *(Id*.) Next, the ALJ concluded that Dr. Williams's opinion "was contradicted by the State agency consultants' opinions," which the ALJ gave greater weight, "as they had the opportunity to review more of the claimant's record longitudinally and their opinions were more consistent with the evidence overall." *(Id*.) Finally, the ALJ noted that Dr. Williams's letter was provided seven days after the Notice of Hearing

was sent to Plaintiff, and the "contemporaneous appointment notes revealed that the claimant reported somewhat more aggravated symptoms than shown in the last visit with Dr. Williams, which was one year earlier." *(Id.*) And, at the earlier appointment, Plaintiff had reported that he was doing better and demonstrated improvement with medication. *(Id.*) The Court concludes that the ALJ's assessment of Dr. Williams's opinions is legally insufficient and not supported by substantial evidence.

Dr. Williams met with Plaintiff on November 19, 2013, the same date he authored his opinion. (R. 326, 334–36.) The ALJ implied that Dr. Williams's opinion was less credible because the opinion was dated one week after the Notice of Hearing was mailed to Plaintiff, and Plaintiff reported "somewhat more aggravated symptoms" than had been reported at his previous visit in September 2012, at which time Plaintiff had indicated that he was doing better and indicated the medications were helping. (R. 31.)

The Court can quickly dispose of the ALJ's comments regarding the timing of Dr. Williams's opinion. The fact that relevant evidence has been solicited by a claimant is not a sufficient justification to belittle or ignore that evidence. *See Moss v. Astrue,* 555 F.3d 556, 560–61 (7th Cir. 2009); *Reddick v. Chater,* 157 F.3d 715, 726 (9th Cir. 1998). Quite the contrary, in fact. "The claimant bears the burden of submitting medical evidence establishing [his] impairments and [his] residual functional capacity. How else can [he] carry this burden other than by asking [his] doctor to weigh in?" *Punzio*, 630 F.3d at 712. Stated another way, the mere fact that

Plaintiff was seeking assistance with his disability paperwork is not an appropriate reason to discredit Dr. Williams's opinions. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *12 (N.D. Ill. Feb. 6, 2012) ("[S]imply because [the plaintiff] was seeking disability and required such paperwork does not mean that the doctor's treatment was any less legitimate. The ALJ simply fails to explain how the completion of necessary paperwork for a patient . . . mitigates the credibility or accuracy of a treating doctor's medical opinion.").

As for Plaintiff's reports of "somewhat more aggravated symptoms," and the "essentially unremarkable" mental status examinations, it is clear that the ALJ failed to consider the nature of mental illnesses and the waxing and waning of symptoms. Because mental illness tends to be episodic, the ALJ cannot extrapolate from days where Plaintiff seems to be doing better to conclude that he has improved his condition. *See Punzio,* 630 F.3d at 710 ("But by cherry-picking [the treating psychiatrist's] file to locate a single treatment note that purportedly undermines her overall assessment of [the claimant's] functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness. As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.") (citations omitted); *Bauer,* 532 F.3d at 609 ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she

is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.").

The ALJ also concluded that because Dr. Williams made no medication changes and recommended a three month follow-up visit, Dr. Williams's treatment notes from that day did not "wholly support" his opinion that Plaintiff's condition was disabling. (R. 30.) "If the ALJ concludes that the treating physician's opinion is inconsistent with other evidence, she must explain the inconsistency." *Probes v. Barnhart*, 467 F. Supp. 2d 808, 819 (N.D. Ill. 2006). Here, the ALJ has read inconsistency into Dr. Williams's notes too quickly, and his conclusions are speculative at best. "There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." *Scott*, 647 F.3d at 739. Dr. Williams's notes show that Plaintiff's symptoms persisted even though medication helped. The ALJ failed to acknowledge this and other relevant competing evidence and failed to explain why the evidence relied on was more persuasive in supporting the ALJ's conclusion. Instead, the ALJ has impermissibly "cherry-picked" from the mixed results in Dr. Williams's notes to support a denial of benefits. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Moreover, finding Dr. Williams's opinion to be inconsistent with or not "wholly" supported by his notes from that particular day is not the same as finding the opinion inconsistent with the record as a whole. The ALJ acknowledged that Dr. Williams's report of Plaintiff's subjective symptoms indicated "some" mental health limitations, but placed great emphasis on the "essentially unremarkable" mental

status examinations. (R. 30–31.) However, as previously mentioned, symptoms wax and wane. For this reason, the Seventh Circuit has held that it is not a contradiction to find that a claimant has a severe and disabling mental illness yet "was behaving pretty normally during [his] office visits." *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). The ALJ's opinion did not consider this possibility when he placed weight on the fact that Plaintiff had no remarkable mental status examinations. The Court also notes that the ALJ gave "very little weight" to Plaintiff's GAF scores, declaring them to be "transient in nature," or, in other words, merely "one-time" assessments. (R. 31.) "But this seems to be cherry-picking: if the GAF scores were unreliable anecdotal snapshots, then this same criticism would apply to the mental status examinations." *Lewis v. Colvin*, No. 14 C 50195, 2016 WL 4530338, at *5 (N.D. Ill. Aug. 30, 2016).

Furthermore, "while an ALJ has no duty to give any weight to an individual GAF score, she cannot ignore or reject without evidentiary basis a whole series of GAF scores favorable to the claimant." *Diaz v. Colvin*, No. 13 C 04034, 2014 WL 4898261, at *4 (C.D. Ill. Sept. 29, 2014). While the American Psychiatric Association no longer uses the GAF metric, *see Williams v. Colvin*, 757 F.3d 610. 613 (7th Cir. 2014), at the time of Plaintiff's psychological evaluations, clinicians still used GAF scores to indicate a "clinician's judgment of the individual's overall level of functioning." *DSM-IV* at 32. Here, Plaintiff's repeated GAF score of 45 indicates serious symptoms, including suicidal ideation and serious impairment in social and occupational functioning. *DSM-IV* at 34. It is true that GAF scores are not

*dispositive* of Plaintiff's disability. *See Denton,* 596 F.3d at 425 (explaining that the GAF score does not necessarily reflect a doctor's opinion of functional capacity because the score measures severity of both symptoms *and* functional level). Nevertheless, Plaintiff's GAF scores are *evidence* suggesting a far lower level of functioning than the ALJ assigned. *Yurt v. Colvin,* 758 F.3d 850, 859–60 (7th Cir. 2014) (explaining that although the ALJ was not required to give any weight to individual GAF scores, "the problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to Yurt's claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC").

The ALJ additionally criticized Dr. Williams's opinion because "the opinion of disability is an issue reserved for the Commissioner." (R. 31.) True, the regulations do reserve to the Commissioner "the *final* responsibility for deciding residual functional capacity (ability to work—and so whether the applicant is disabled)." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (emphasis in original). However, simply because a treating physician asserts that a claimant is too disabled to work is not a valid reason to accord that physician's opinion little weight. *See Moore v. Colvin,* 743 F.3d 1118, 1126–27 (7th Cir. 2014) (holding that an ALJ could not dismiss treating physician's opinion that claimant was disabled simply because the issue was reserved to the Commissioner); *Garcia v. Colvin,* 741 F.3d 758, 760 (7th Cir. 2013) (same). "If it were a valid reason, then every treating

physician's opinion in every case would be worthless." *Larson v. Colvin*, 26 F. Supp. 3d 798. 808 (N.D. Ill. 2014).

The ALJ's final rationale—that Dr. Williams failed to provide a function-by-function analysis—fares no better. A treating physician is not required to make a function-by-function analysis. *Minett v. Colvin*, No. 13 C 4717, 2015 WL 7776560, at *3 (N.D. Ill. Dec. 2, 2015); *see also Nash v. Colvin*, No. 12 C 6225, 2013 WL 5753796, at *12 (N.D. Ill. Oct. 23, 2013); *Colson v. Colvin*, 120 F. Supp. 3d 778, 791–92 (N.D. Ill. 2015) ("Dr. Putini's failure to provide [a function-by-function analysis] . . . does not support the ALJ's decision to disregard her opinions."). Thus, it was improper for the ALJ to use Dr. Williams's failure to provide a function-by-function analysis as a basis for discounting Dr. Williams's opinions.

Even assuming, *arguendo*, the ALJ provided "good reasons" for not affording Dr. Williams's opinion controlling weight, he was still required to address the factors listed in 20 C.F.R. § 404.1527 to determine what weight to give the opinion. Social Security Ruling ("SSR")[10] 96-2p. SSR 96-2p states that treating source medical opinions "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." SSR 96-2p; *see* 20 C.F.R. § 404.1527(c); *Yurt*, 758 F.3d at 860; *Moss*, 555 F.3d at 561.

---

[10] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 201 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the court is "not invariably bound by an agency's policy statements, the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 556 F.3d 736, 744 (7th Cir. 2009).

Here, the ALJ gave Dr. Williams's opinion little weight but failed to address many of the enumerated factors provided in 20 C.F.R. § 404.1527. Specifically, the ALJ did not discuss the nature and extent of the treatment relationship, the frequency of examinations, the supportability of the decision, the consistency of the opinion with the record as a whole, or whether Dr. Williams had a relevant specialty. Multiple factors favor crediting Dr. Williams's opinions, and "proper consideration of these factors may have caused the ALJ to accord greater weight to [Dr. Williams's] opinions." *Campbell*, 627 F.3d at 308. Accordingly, remand is necessary for the ALJ to properly analyze and explain the weight to be afforded to the opinions of Dr. Williams.

The Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and her ultimate conclusions, whatever those conclusions may be. *See, e.g., Myles v. Astrue,* 582 F.3d at 678 ("On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions."); *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994). The Commissioner should not assume that any other claimed errors not discussed in this Order have been adjudicated in her favor. On remand, the Commissioner therefore must carefully articulate her findings as to every step.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 14] is granted in part, and the Commissioner's cross-motion for summary judgment [Doc. No. 24] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**

**ENTERED:**

**DATE:** _____ **August 29, 2017**    _____

**HON. MARIA VALDEZ**
**United States Magistrate Judge**